**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
SHARAREH NOORBALOOCHI,                  :
                                        :
                    Plaintiff,          :      **COMPLAINT**
                                        :
        v.                              :
                                        :      **Jury Trial Demanded**
C3.AI, INC.; NIKHIL KRISHNAN, in his    :
individual and professional capacities; and :
HENRIK OHLSSON, in his individual and   :
professional capacities,                :
                                        :
                    Defendants.         :
--------------------------------------------------------------X

Plaintiff Sharareh Noorbaloochi ("Dr. Noorbaloochi" or "Plaintiff"), by and through her

undersigned counsel, Wigdor LLP, hereby alleges as and for her Complaint against C3.ai, Inc.

("C3" or the "Company"), Nikhil Krishnan ("Dr. Krishnan"), and Henrik Ohlsson ("Dr. Ohlsson")

(together, "Defendants"), as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      In the highly competitive and male-dominated field of technology and artificial

intelligence ("AI"), Plaintiff Dr. Sharareh Noorbaloochi has excelled.

2.      In the span of a few years at C3.ai, a provider of Enterprise AI software founded by

Silicon Valley entrepreneur Tom Siebel, Dr. Noorbaloochi received multiple promotions,

extremely lucrative performance bonuses, and effusive praise from her supervisors.  Indeed, after

only three years at the Company, she served as the highest-ranking female employee in the Data

Science division.

3.      Despite her accomplishments, however, in January 2025, Dr. Noorbaloochi's

supervisors at C3 informed her that she would not be promoted.  They acknowledged that her work

1

product had remained excellent, stating that "interpersonal issues" and concerns from Human Resources motivated their failure to promote her.

4.      Her supervisors explicitly made clear that the term "interpersonal issues" referred to two incidents where Dr. Noorbaloochi had called out male colleagues' rude, demeaning, and hostile treatment of her.

5.      In both incidents, she had specifically noted the ways that she had been treated less well than her male counterparts, and in both instances, explained that the work environment was abusive to her as a woman.

6.      Dr. Noorbaloochi's supervisors openly admitted that the promotion had been denied because she spoke up about these concerns—that is, concerns that the work environment was hostile to women like her.

7.      Soon after, Dr. Noorbaloochi told her supervisors that she felt that the denied promotion had been an act of retaliation in response to her complaints concerning the gender issues in the work environment at C3.

8.      Unbeknownst to Dr. Noorbaloochi, this magic word—"retaliation"—signaled to C3 that she might publicly expose the hostile work environment at the Company.

9.      The Company immediately sprang into action, expressly soliciting negative feedback about Dr. Noorbaloochi to provide it cover should she ever bring legal claims.

10.     C3 quickly fired Dr. Noorbaloochi for alleged "poor performance," despite having made clear to her only months prior that her performance was outstanding.

11.     Dr. Noorbaloochi did not develop "interpersonal issues" overnight.

12.     Nor did Dr. Noorbaloochi's performance drop off a cliff in the short time since her supervisors told her that her work product remained excellent.

13.     She was the same as she had been throughout her tenure at C3, where she had received repeated promotions and positive feedback.

14.     Nothing had changed except that she had begun speaking up about a work environment hostile to the few women in high-performing roles.

15.     Dr. Noorbaloochi now seeks to rectify Defendants' unlawful treatment of her and expose the way they treat female employees.

16.     Defendants' actions violated the New York Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL"), and the California Fair Employment & Housing Act, Cal. Gov. Code §§ 12940 *et seq.* ("FEHA").

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship among the parties and this action involves an amount in controversy exceeding $75,000, excluding interest and costs.

18.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred here.

## ADMINISTRATIVE PROCEDURES

19.     Plaintiff will file a charge of Discrimination with the U.S. Equal Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), contemporaneously with the filing of this Complaint.  Plaintiff will seek leave to file an Amended Complaint adding claims under Title VII immediately following receipt of a Notice of Right to Sue from the EEOC.

20.     A copy of this Complaint will be served upon the New York Commission on Human Rights and the New York City Law Department, Office of Corporation Counsel, within 10 days of its filing pursuant to NYCHRL § 8-502, thereby satisfying the NYCHRL's notice requirements.

21.     On September 10, 2025, Plaintiff filed a Charge of Discrimination with the California Civil Rights Department ("CRD").  That same day, the CRD issued Plaintiff a Notice of Right to Sue.

22.     Plaintiff has complied with all other prerequisites to filing this action.

## PARTIES

23.     Plaintiff Dr. Sharareh Noorbaloochi is a resident of the State of New York. Dr. Noorbaloochi met the definition of an "employee" under all relevant statutes at all relevant times herein.

24.     Defendant C3.ai, Inc. is a Delaware corporation.  Its principal place of business is located at 1400 Seaport Boulevard, Redwood City, CA 94063.  C3 met the definition of an "employer" under all relevant statutes at all relevant times herein.

25.     Defendant Nikhil Krishnan is a Senior Vice President and Chief Technology Officer, Data Science at C3.  Dr. Krishnan supervised and had authority over the terms and conditions of Dr. Noorbaloochi's employment and met the definition of an "employer" under all relevant statutes at all relevant times herein.  Dr. Krishnan is a resident of the State of California and was located in California at all relevant times herein.

26.     Defendant Henrik Ohlsson is a Vice President and Chief Data Scientist at C3.  Dr. Ohlsson supervised and had authority over the terms and conditions of Dr. Noorbaloochi's employment and met the definition of an "employer" under all relevant statutes at all relevant

times herein.  Dr. Ohlsson is a resident of the State of California and was located in California at all relevant times herein.

## FACTUAL ALLEGATIONS

### I.    BACKGROUND

#### A.    The Technology Sector's Gender Problem

27.    It is well known that AI companies and other Silicon Valley corporations are male-dominated and have faced scrutiny for failing to elevate women to leadership roles and for maintaining cultures that condone and even promote misogyny.

28.    For example, women have been estimated to make up just a quarter of all employees in the tech industry, and only eleven percent of executives.[1]

29.    The women that do make it to high-level roles face heightened scrutiny and sexism masked as "feedback."[2]  Eighty-four percent of senior-level women in tech have been told that they are "too aggressive," and 52 percent have felt "excluded from important business events because of gender."[3]

30.    Further, women in tech often find "[t]heir expertise is challenged, their contributions are not well-received and their roles are diminished."[4]  And this type of undermining behavior is far from the worst treatment that these women face: so-called "casual" sexism,

---

[1]    Sheelah Kolhatkar, *The Tech Industry's Gender-Discrimination Problem*, The New Yorker, Nov. 13, 2017, https://www.newyorker.com/magazine/2017/11/20/the-tech-industrys-gender-discrimination-problem.

[2]    *See*, *e.g.*, Trae Vassallo & Michele Madansky, *Silicon Valley Has a Gender Discrimination Problem—and These Women Can Prove It*, TIME, Feb. 18, 2016, https://time.com/4226297/silicon-valley-gender-discrimination-data-elephant-in-the-valley/.

[3]    *Id.*

[4]    Vandana Singh, *The Retention Problem: Women Are Going into Tech but Are Also Being Driven Out, The Conversation* (Mar. 3, 2023), https://theconversation.com/the-retention-problem-women-are-going-into-tech-but-are-also-being-driven-out-200625.

discrimination, and misogyny often turn into rampant sexual harassment and even explicit death threats.[5]

31.    When these women face sexual harassment and are able to report it to superiors, their concerns are brushed off and dismissed.

32.    C3 is no stranger to the gender disparities endemic to the technology industry.  The highest levels of leadership are almost exclusively male:



33.    Lower rungs of leadership are similarly male-dominated.

34.    As explained below, Dr. Noorbaloochi was the most senior female in the Data Science division.  All Vice Presidents in that division were men, and not a single woman served as a Director.

35.    And unfortunately, Dr. Noorbaloochi's experience at C3 confirmed the way these personnel disparities manifest in discriminatory and unequal treatment for women, as evidenced by the Company's treatment of her, including the unjust denial of a promised promotion and the wrongful termination of her employment.

---

[5]    *Id.*

### B.    Dr. Noorbaloochi's Professional Background

36.    Prior to joining C3 in April 2020, Dr. Noorbaloochi had amassed a wealth of relevant experience at prestigious institutions and companies.

37.    She graduated *summa cum laude* with a bachelor's degree in Electrical Engineering from the University of Minnesota, where she was one of very few women in her cohort.

38.    She went on to earn her PhD in Electrical Engineering from Stanford in 2013, specializing in Cognitive Neuroscience.

39.    At Stanford, she was again one of just a few women graduating in the male-dominated Electrical Engineering field.

40.    Dr. Noorbaloochi's PhD research on how deadline pressure affects human decision-making was published in the *Journal of Neuroscience*, one of the field's most cited publications.

41.    After graduating, she was quickly hired as a Postdoctoral Associate at New York University, where she secured grant funding, designed and executed behavioral and MRI-based political psychology experiments, and published several scholarly articles and a book chapter.

42.    In January 2016, Dr. Noorbaloochi moved to the private sector.  She started as a Fellow at Insight Data Science before moving on to Time, Inc. and Goldman Sachs.

43.    Within five years of her graduation from Stanford and two years of leaving New York University, Dr. Noorbaloochi became a Vice President of Decision Science at Goldman Sachs, where she built marketing and acquisition models for personal loan products, developed funnel models to increase customer conversion rates, and created a collection model to reduce non-payment rates.

## II.    DR. NOORBALOOCHI JOINS C3 AND EXCELS IN HER ROLE

44.     In April 2020, Dr. Noorbaloochi accepted an offer to work at C3 as a Data Science Lead.

45.     The Company had recruited her even though she did not apply for the job.  Dr. Noorbaloochi was persuaded to join the then-start up instead of accepting a promising position within Goldman Sachs.

46.     It appeared to be a golden opportunity—C3 was an innovative, fast-growing leader in one of the hottest fields in the industry.  She would be able to use the skills she had worked so hard to develop to make a real difference at a company that she believed in.  And for the first few years of her employment, things went exceedingly well.

47.     Dr. Noorbaloochi was promoted to Director just over a year after being hired.

48.     Just nineteen months after that, she earned the title of Senior Director.

49.     In less than three years, Dr. Noorbaloochi had become the highest-ranking woman in data science at C3.

50.     Dr. Noorbaloochi was hired to lead C3's data science efforts in the financial services sector, with a primary focus on the Bank of America Center of Excellence, and subsequently oversaw additional engagements with major global institutions, including the Society for Worldwide Interbank Financial Telecommunication ("SWIFT"), as well as projects spanning banking, payments, and market infrastructure.

51.     Dr. Noorbaloochi later focused on leading C3's healthcare data science initiatives, contributing to proposal preparation efforts for public health systems such as the National Health Service ("NHS"), and overseeing engagements with Quest Diagnostics ("Quest") and Bristol Myers Squibb.

52.     Dr. Noorbaloochi was the Senior Data Science Leader for C3's Center of Excellence at Bank of America.  Dr. Noorbaloochi, who worked out of C3's New York office, maintained a constant presence near Bank of America's New York City headquarters, located just a block away.

53.     She oversaw both the Global Securities Lending ("GSL") and Global Transaction Services ("GTS") divisions from a data science perspective, acting as the most senior department leader on the account.

54.     Dr. Noorbaloochi managed all data science efforts across GSL and GTS, which included ensuring rigorous model development, documentation for Model Risk Management ("MRM") compliance, and successful deployment into production.

55.     She sustained client confidence in C3 by regularly meeting with and speaking to business stakeholders.  And she carefully built and scaled the data science teams for both GSL and GTS.

56.     Over the course of her tenure as a leader at the Bank of America Center of Excellence, Dr. Noorbaloochi onboarded and guided sixteen C3 data scientists who worked on the projects, many of whom are still employed at C3.

57.     She served as the principal AI lead on the Quest Diagnostics partnership, which, due to Dr. Noorbaloochi's technical leadership and consistent client engagement, expanded from a six-month pilot initiative to a multi-year strategic engagement.

58.     Dr. Noorbaloochi met weekly with Quest's Head of AI and translated abstract clinical goals into actionable machine learning problems.

59.     Internally, she recruited high-performing team members, led technical workshops, and established a journal club to keep the delivery team aligned during periods of resource instability.

60.     Tom Siebel ("Mr. Siebel"), C3's Chairman and CEO, recognized and acknowledged Dr. Noorbaloochi's leadership.  Mr. Siebel personally asked Dr. Noorbaloochi to focus her energies on Quest and would strategize with her directly ahead of key executive meetings.

61.     In December 2024, Mr. Siebel repeatedly emphasized Dr. Noorbaloochi's contributions and noted her leadership as part of selling the deal to this valuable client.

62.     Further, Dr. Noorbaloochi is a listed inventor on C3's pending patent for AI-driven clinical embeddings in precision medicine, Artificial Intelligence for Precision Medicine (Nov. 28, 2024, No. US20240395404A1), which outlines a method for generating embeddings from clinical laboratory data—such as blood test results—that can be used to create patient-level representations.  These embeddings allow machine learning systems to track patient health over time, detect disease progression patterns, and inform clinical decision-making.  Dr. Noorbaloochi made meaningful contributions to the patent's development.

63.     Meanwhile, Dr. Noorbaloochi played a key role in securing a strategic engagement with Bristol Myers Squibb, a leading global biopharmaceutical company.

64.     Dr. Noorbaloochi also served as C3's key technical contact, which required frequent onsite client meetings and the nurturing of a strong rapport with scientific and business stakeholders.  Dr. Noorbaloochi's efforts were instrumental in moving the project from concept to execution and in earning the trust of Bristol Myers Squibb leadership.

65.     Dr. Noorbaloochi scaled C3's New York data science team from three people to eighteen, helping turn a satellite office that once had just 20 total employees into an 80-plus employee hub that continues to grow.

66.     Because of her success, in May 2024, Dr. Krishnan, C3's Senior Vice President and Chief Technology Officer, Data Science, told her that she should expect a promotion to Vice President during the next promotion cycle if she took on additional responsibilities: namely, overseeing data science projects from New York that had historically been managed from C3's Redwood City office.

67.     Dr. Noorbaloochi was able to rise quickly through the ranks at C3 because her work product was exemplary, and perhaps more importantly, because she kept her head down.  Although Dr. Noorbaloochi had always been acutely aware of the systemic bias rampant in tech, she felt that everything at C3 would be fine so long as she continued to create value for the Company.

68.     Similarly, her myriad accomplishments while at C3 came in spite of a hostile work environment perpetuated by male colleagues and superiors loath to the idea of a woman in a high-achieving position of authority.

69.     But when Dr. Noorbaloochi complained about gender discrimination, they began to see her as a problem, and the Company swiftly decided to get rid of her.  They set traps and laid the groundwork for her eventual termination, all the while reassuring her that her position was safe.

## III.    DEFENDANTS SUBJECT DR. NOORBALOOCHI TO A WORK ENVIRONMENT HOSTILE TO WOMEN

### A.    Dr. Noorbaloochi Complains About Dr. Ohlsson's Frequent Attempts to Diminish Her Role

70.     As soon as she started at C3, Dr. Noorbaloochi faced bizarre pushback to her very presence in a supervisory role.

71.     Dr. Ohlsson refused to acknowledge that Dr. Noorbaloochi held the position that she did because he was concerned that Qiwei Li ("Mr. Li"), a male employee two levels below Dr. Ohlsson on the corporate hierarchy, would be "upset" that Dr. Noorbaloochi managed other employees while he did not.

72.     At the time, Dr. Noorbaloochi believed that Mr. Li's apparent discomfort stemmed from her relative lack of experience at C3, but she now recognizes that he simply could not face the idea that a woman would be placed in a role with more supervisory authority than his own.

73.     Ultimately, Dr. Noorbaloochi had to escalate this issue to Dr. Krishnan.  She told him that she had left Goldman Sachs for a specific job at C3 and that she had been incomprehensibly obstructed from doing her job.

74.     Dr. Krishnan stepped in and solved the problem, and Dr. Noorbaloochi chalked the entire situation up as a misunderstanding.  After all, she was the newer employee and did not want to be part of any workplace drama.

75.     However, over the next several years, Dr. Noorbaloochi faced differential treatment when compared to her male colleagues.

76.     For example, she would frequently be excluded from data science planning meetings that she unquestionably should have been a part of.

77.     When she and her colleagues would facilitate presentations at an annual Company meeting, Dr. Noorbaloochi would notice Dr. Ohlsson taking substantial time to help male colleagues with their deliveries but leave her to deal with a complicated issue on her own.

78.    He and Dr. Noorbaloochi's male Data Science colleagues did not even show up to her session.

79.    Dr. Ohlsson would also use gendered language to criticize Dr. Noorbaloochi; for example, he pejoratively called her "emotional" during a meeting.

80.    He would attempt to minimize Dr. Noorbaloochi's contributions: for example, he removed Dr. Noorbaloochi's name from a public staffing sheet and replaced it with that of a male colleague.

81.    The situation was at one point so dire that Dr. Noorbaloochi requested that she report directly to Dr. Krishnan.

82.    Dr. Ohlsson, without providing any advance notice, re-staffed a project that had been overseen by Dr. Noorbaloochi and assigned Romain Juban ("Mr. Juban"), a Redwood City employee, to supervise Dr. Noorbaloochi's work.

83.    She reached out to Dr. Krishnan about this abrupt change and told him that it felt "colonial" and "sexist" to have Mr. Juban remotely oversee her team and work.

84.    Dr. Krishnan simply wrote back that he was "sorry to hear" and indicated that he did not know about the reorganization.

85.    He said he would fix the problem and that Dr. Ohlsson should not have gone ahead and made the changes without his approval.

86.    Dr. Ohlsson would also hypocritically call out Dr. Noorbaloochi for being late or having to reschedule meetings.

87.    Even though Dr. Ohlsson himself and nearly every other C3 employee would be forced to do the same thing at times, Dr. Noorbaloochi never heard Dr. Ohlsson criticize a male colleague for lateness or for having to reschedule meetings.

88.     She faced unrealistic expectations that her male counterparts did not, but she never spoke up because she believed in Mr. Siebel's mission and vision.

89.     She felt that as long as she continued to produce tangible results for the Company, she would continue to be rewarded when it came time for performance reviews, promotions, and merit-based bonuses.

    **B.**    **C3 Fails to Investigate After Dr. Noorbaloochi Reports Fearing for Her Safety Due to Unwelcome Sexual Advances**

90.     Dr. Noorbaloochi also faced unwelcome sexual advances while at C3.

91.     In March 2022, during the Company-sponsored Transform Conference in Miami, she discovered an anonymous, sexually suggestive note left on the dresser inside her assigned hotel room.

92.     The note contained a phone number and read, "[c]all me if you want to have fun."

93.     Importantly, the note appeared after Dr. Noorbaloochi had already spent a night inside the room, indicating that someone knowingly entered an occupied space to leave the message.

94.     This blatant and unnerving invasion of privacy understandably caused Dr. Noorbaloochi to become fearful for her safety.

95.     She immediately reported the incident to C3's Office Manager, as well as a General Manager of Financial Services, but the Company never formally investigated what had happened.

96.     The Office Manager called the phone number left on the note, and members of Mr. Siebel's security staff approached Dr. Noorbaloochi briefly, but no one ever followed up with Dr. Noorbaloochi.

97.    Given the fact that whoever left the note not only knew which room Dr. Noorbaloochi had originally been staying in, but also was able to enter the room, changing rooms did little to solve the problem.

98.    As far as Dr. Noorbaloochi is aware, C3 did not formally document the incident or make any substantial efforts to identify who had left the note or otherwise protect Dr. Noorbaloochi during the event.

### C.    Dr. Noorbaloochi's Male Colleagues Undermine Her and Make Her Job Unreasonably Difficult

99.    In early 2024, Dr. Noorbaloochi began working with Tiger Huang ("Mr. Huang") on the Quest project.

100.    Mr. Huang, then a Director, was below Dr. Noorbaloochi in the corporate hierarchy but did not report to her.

101.    Huang's supervisor was Dr. Mehdi Maasoumy ("Dr. Maasoumy"), a Vice President.

102.    On multiple occasions while working on the project together, Mr. Huang was particularly inappropriate and rude toward Dr. Noorbaloochi, regularly interrupting her and undermining her expertise.

103.    When she tried to make a comment or express her opinion during meetings, Mr. Huang would frequently cut her off and speak over her.

104.    When she left comments on written work, Mr. Huang would ignore them.

105.    When she issued directions, Mr. Huang would not follow them.

106.    Perhaps most egregiously, Mr. Huang would refuse to consult Dr. Noorbaloochi before corresponding with Mr. Siebel about the project, despite her having made multiple direct requests—both publicly and privately—that he do so.

107.    At C3, consulting with the manager overseeing a project before communicating with Mr. Siebel about the project was common practice.

108.    Mr. Huang's repeated attempts to circumvent Dr. Noorbaloochi's leadership and cut her out of communications with the head of the Company were not only unprofessional but also stymied the project's efficiency because Dr. Noorbaloochi was kept out of the loop.

109.    Dr. Noorbaloochi was keenly aware of the fact that Mr. Huang never treated male colleagues the same way.

110.    As the only female data scientist on the project, she was the only one who dealt with Mr. Huang's rude and dismissive behavior.

111.    Some of her colleagues even pointed out what was going on.  For example, when Mr. Huang ignored Dr. Noorbaloochi's comments left on shared documents, her junior male team members would add that they agreed with what Dr. Noorbaloochi had said, likely in efforts to highlight and advocate the comment to Mr. Huang.

112.    Notably, Dr. Maasoumy never did anything to stop Mr. Huang, even though he plainly observed this behavior and had the ability to discipline Mr. Huang for his differential treatment of one of the only women leaders in the workplace.

113.    Dr. Maasoumy's inaction was a tacit endorsement of Mr. Huang's actions; indeed, Mr. Huang felt enabled to ramp up his mistreatment because Dr. Maasoumy never called out his direct report's mistreatment of Dr. Noorbaloochi.

IV.    **DR. NOORBALOOCHI COMPLAINS OF GENDER HOSTILITY**

114.    By Summer 2024, Dr. Noorbaloochi had had enough.  She asked Mr. Huang why she had been excluded from an email to Mr. Siebel.

115.    At first, he ignored her.  Then, he tried to blame Dr. Maasoumy.

116.    Regardless, he showed no understanding that what he did was improper, much less contrition.

117.    And he continued to undermine Dr. Noorbaloochi.

118.    That same month, Dr. Noorbaloochi again told Mr. Huang directly—this time with Dr. Ohlsson and Dr. Maasoumy present—that she felt he had been treating her unfairly.

119.    When Mr. Huang tried to deflect and minimize her concerns, Dr. Noorbaloochi said "I hope this [treatment] isn't because of my gender."

120.    Mr. Huang immediately became defensive and lashed out: "Are you calling me sexist?"

121.    Critically, neither Dr. Ohlsson nor Dr. Maasoumy spoke up.

122.    Mr. Huang quickly turned the conversation away from Dr. Noorbaloochi's valid critiques and zeroed in on the idea that he had been labeled "sexist."

123.    The conversation ended without any sort of resolution, and without either supervisor stepping in or escalating Dr. Noorbaloochi's complaint of disparate treatment based on gender.

124.    Incensed at the idea that Dr. Noorbaloochi would try to stand up for herself, Mr. Huang worked to get ahead of the situation.

125.    Mr. Huang falsely told Dr. Maasoumy that "she had called [Dr. Maasoumy] a sexist too," leading him to reach out to Dr. Noorbaloochi, when in reality, Dr. Noorbaloochi had merely expressed frustration that Dr. Maasoumy himself had participated in Mr. Huang's exclusion of her from communications with Mr. Siebel.[6]

---

[6]    Dr. Noorbaloochi ultimately was told that Dr. Maasoumy "prepared" the communications with "input" from Mr. Huang.  The extent of Dr. Maasoumy's involvement in the decision to

126.    Although she certainly questioned whether her gender had to do with Dr. Maasoumy's actions, she did not call him a "sexist."

127.    In fact, not wanting to further escalate toxic dynamics on the team, Dr. Noorbaloochi attempted to downplay her complaint and de-personalize her allegations by suggesting that the mistreatment she experienced was not based on "intentional" bias against women.

128.    On July 26, 2024, Dr. Noorbaloochi wrote to Dr. Maasoumy:

> If I believed there was a clear and intentional sexist bias, I would have pursued the matter with HR. However, it is crucial to address the core issue here: communication and consultation. . . . Sexual bias is a real issue in the tech industry, and we should all be aware of it. My intention is to foster an inclusive and respectful work environment at C3 where everyone's contributions are recognized and valued. It is essential to ensure that no one feels ignored or disrespected, and leaders take an inclusive approach towards minority groups that have historically been and continue to be marginalized, whether consciously or unconsciously.

129.    Of course, Dr. Noorbaloochi was right when she brought up institutional biases.[7] And in reality, Dr. Noorbaloochi had been treated dismissively by many male leaders at C3, including being left off emails, excluded from meetings, talked over, and ignored. Male employees at Dr. Noorbaloochi's level—even those who performed poorly—were treated with more respect and consideration, including by receiving credit for work to which Plaintiff had materially contributed.

---

exclude Dr. Noorbaloochi remains unclear, although he did have contemporaneous knowledge of the exclusion and therefore, at the very least, tolerated it.

[7]    *See supra* § I.A.

130.    Dr. Noorbaloochi's statement— "I hope this [treatment] isn't because of my gender" —was meant to express her concerns about these same biases manifesting themselves at C3 in a way that made it increasingly difficult for her to do her job.

131.    Dr. Noorbaloochi had, in fact, made it abundantly clear to Dr. Maasoumy how he and Mr. Huang had hindered her ability to lead.

132.    Mr. Huang had also taken the extraordinary action of preemptively reporting Dr. Noorbaloochi to C3's Human Resources department ("HR").

133.    The exact nature of Mr. Huang's "report" is unclear, as Dr. Noorbaloochi had simply expressed her hope that the rampant mistreatment Mr. Huang had subjected her to was not because she was a woman.

134.    Mr. Huang could not have alleged that Dr. Noorbaloochi had done anything inappropriate herself, as she had not.

135.    It thus appears that his "report" was simply his means of getting ahead of any potential complaint *against him* so that he could frame the narrative in a way that made Dr. Noorbaloochi look as bad as possible.

136.    HR took no remedial action.

137.    Instead, C3's Vice President of HR, Devon Taylor ("Mr. Taylor"), actively took steps to discourage Dr. Noorbaloochi from filing any official complaint herself, telling her that any complaint would be futile because, in his view, "she had no case."

138.    Mr. Taylor reached this conclusion without having investigated Dr. Noorbaloochi's claims in any depth or having made any independent inquiry into what he understood had taken place between Mr. Huang and Dr. Noorbaloochi.

139.    Instead, he had merely held a brief conversation with Dr. Noorbaloochi where he had focused more on dissuading her from reporting the gender discrimination she had articulated than on rectifying the situation or otherwise ensuring that Dr. Noorbaloochi was not further discriminated against.[8]

140.    Incredibly, Mr. Taylor even suggested that Dr. Noorbaloochi rectify her concerns by giving Mr. Huang a negative performance review (she did not do so).

141.    Mr. Taylor was not the only C3 employee who tried to prevent Dr. Noorbaloochi from amplifying her concerns.

142.    Adi Bhashyam ("Mr. Bhashyam"), C3's Senior Vice President of North American Sales, also chastised Dr. Noorbaloochi for her "mistake" of speaking up in the first place.

143.    He advised against any further escalation (which Dr. Noorbaloochi understood as officially memorializing her complaints).

144.    Mr. Bhashyam, who was a mentor and confidant to Dr. Noorbaloochi, told her "you're going to hurt yourself by doing this."

145.    He correctly predicted that any allegation of sexism at C3 would bounce back and only harm Dr. Noorbaloochi herself.

146.    Dr. Noorbaloochi had previously suggested to Mr. Bhashyam that he find a male Data Science leader to work with Mr. Huang, saying that she would even step aside for the sake of the project.

147.    Mr. Bhashyam instead told her to try to work things out with Mr. Huang.

---

[8]    Separately, Dr. Noorbaloochi forwarded Mr. Taylor the message she had sent to Dr. Maasoumy.  Mr. Taylor never acknowledged receipt.

148.    What neither Mr. Taylor nor Mr. Bhashyam made clear was that Dr. Noorbaloochi had already crossed the Rubicon.

149.    Simply making an unofficial complaint—expressing her hope that differential treatment was not based on gender—would have catastrophic consequences for Dr. Noorbaloochi's future at C3.

150.    Dr. Noorbaloochi did not realize this at the time.  Her conversations with Mr. Taylor and Mr. Bhashyam caused her to believe that if she spoke no further of gender discrimination or anything similar, she could move forward.

151.    Mr. Huang gradually disassociated himself from the Quest project.

152.    He began contributing less and less, to the point that he began noticeably taking video calls with Quest executives from another company's parking lot.

153.    Dr. Maasoumy decided to give Dr. Noorbaloochi the cold shoulder.  He would speak to her as little as possible—when he visited C3's New York office, he would go so far as to completely ignore her.

154.    This was particularly hurtful, considering that Dr. Noorbaloochi had considered Dr. Maasoumy a friend.

155.    Nonetheless, Dr. Noorbaloochi continued to work hard and received reassuring feedback from Mr. Siebel.

156.    In October 2024, Mr. Siebel called Dr. Noorbaloochi and told her that she had been doing well, to the point that he wanted her to focus specifically on the important Quest project.

157.    "I need you on the Quest project," Mr. Siebel said.

158.    Soon after, in December 2024, he called Dr. Noorbaloochi ahead of a critical executive meeting with Quest leadership to review progress and strategize.

159.    This unusual call signaled to Dr. Noorbaloochi that Mr. Siebel believed in her capabilities and wanted her to assume an even larger role moving forward.

160.    At the meeting, Mr. Siebel praised Dr. Noorbaloochi's expertise in the healthcare space several times and assured Quest's executives that she would be directly overseeing the project's success.

161.    Afterwards, multiple colleagues commented on Mr. Siebel's frequent use of Dr. Noorbaloochi's name.

162.    Mr. Siebel's words demonstrated his belief in Dr. Noorbaloochi's ability to create and maintain client confidence, which was instrumental in securing C3's long-term contract with Quest.

163.    This all lined up with what Dr. Krishnan had told her in May 2024, prior to the incident with Mr. Huang: that she was on track to be promoted to Vice President at the end of the year.

164.    Also in December 2024, C3 held its annual Calibration event, where Data Science leadership would gather to discuss promotions and performance ratings.

165.    Dr. Noorbaloochi participated in a group meeting with several other high-level employees reporting directly to Dr. Ohlsson, including Mr. Li, who was then a Director of Data Science.  Mr. Li had recently become Dr. Ohlsson's direct report and was attending such a Calibration meeting for the first time.

166.    During the meeting, Mr. Li repeatedly interrupted Dr. Noorbaloochi and dismissed her comments.

167.    Frustrated at what she perceived to be a lack of respect from a junior colleague, Dr. Noorbaloochi said that "since this is your first Calibration meeting, maybe it's better for you to listen more and talk less."

168.    Dr. Ohlsson immediately jumped to Mr. Li's defense and reprimanded Dr. Noorbaloochi for *her* supposed disrespect.

169.    Dr. Noorbaloochi and Dr. Ohlsson scheduled a one-on-one meeting soon after to discuss what had happened.

170.    Dr. Noorbaloochi, while defensive initially, was thereafter apologetic for having made the comment, which she understood was harsher than necessary.

171.    However, she was cognizant of the fact that Dr. Ohlsson would not have thought twice about a male colleague telling a junior employee to "listen more and talk less," and was struck at how differently Mr. Li was treated compared to her.

172.    Indeed, she had first heard this exact statement from Mr. Bhashyam when he gave the same directive during a work meeting.

173.    When she said the same thing to Mr. Li, others rushed to Mr. Li's defense.

174.    But when she had specifically questioned whether mistreatment of her was because of her gender, her supervisors were silent.

175.    Because of her experience in July, Dr. Noorbaloochi thought it best to try and apologize and move forward without even addressing the underlying issues that led to her making the comment in the first place, and without further highlighting the continued differential treatment she received as a woman at C3.

176.    She asked Dr. Ohlsson for advice on how to properly apologize to Mr. Li, but he never responded.

177.    She decided to reach out to Mr. Li to schedule a meeting where she would apologize privately, but he did not respond either.

## IV.    DEFENDANTS RETALIATE BY DENYING DR. NOORBALOOCHI A PROMOTION

178.    In early January 2025, after learning that she did not receive a promotion as promised, Dr. Noorbaloochi scheduled a call with Dr. Krishnan to discuss the reasoning behind the Company's decision.

179.    On January 3, 2025, Dr. Noorbaloochi met with Dr. Krishnan via Microsoft Teams.

180.    Dr. Krishnan, who also was a mentor to Dr. Noorbaloochi, quickly told her that the denial had nothing to do with her actual performance.

181.    Quest, which Dr. Noorbaloochi had been focusing on per Mr. Siebel's directive, had "been amazing," Dr. Krishnan said. "Professionally, everyone's super happy with everything you're doing."

182.    Dr. Krishnan said that her "interpersonal issues" were one of two things[9] that led C3 to deny the promotion.

183.    He clarified that the term "interpersonal issues" specifically referred to her interactions with Mr. Huang and Mr. Li.

---

[9]    The second was that Dr. Krishnan wanted Dr. Noorbaloochi and other New York employees to spend more time in the office as opposed to working from home. Dr. Noorbaloochi had been dealing with health issues that forced her to work from home more frequently than she would have liked to. Dr. Krishnan and Dr. Ohlsson both told Dr. Noorbaloochi that she should submit a formal doctor's note if she would need to continue to frequently work from home. Dr. Noorbaloochi felt that doing so would not be worth the risk of retaliation and ultimately spent more time in office through her ultimate termination in May 2025. Given the lack of any follow-up and the fact that in-office attendance was never mentioned as a reason for termination, C3's leadership was clearly satisfied with Dr. Noorbaloochi's response to feedback in this respect.

184.    Both incidents involved Dr. Noorbaloochi raising concerns about gendered dynamics at the Company.

185.    According to Dr. Krishnan, Dr. Noorbaloochi had not been promoted—despite admittedly exemplary work product—because she had: (1) said that she hoped a pattern of deliberate mistreatment from a junior male colleague was "not because of [her] gender"; and (2) had spoken too assertively towards a junior male colleague who had repeatedly interrupted her.

186.    Upon information and belief, this was not the first time that C3 leadership, including Dr. Ohlsson, had unjustly denied a female employee a promised promotion.

187.    Meanwhile, C3 promoted Mr. Huang in late 2024.

188.    His constant interrupting and undermining of Dr. Noorbaloochi, who, at the time, was his superior, was no obstacle to his career development at C3.

189.    Mr. Li was likewise promoted in May 2025.

190.    Critically, Dr. Krishnan made clear that he had been surprised by the denial and that the feedback regarding interpersonal issues had *not* come from her team—rather, the concerns "came from HR."[10]

191.    Dr. Noorbaloochi was surprised to hear that HR had intervened given that her only interactions with HR had been when Mr. Taylor had discouraged her from making a complaint of gender discrimination.

192.    She became concerned that the actual work she had done was meaningless simply because HR had labeled her as a "problematic" woman in the workplace.

---

[10]    Dr. Krishnan did not name the person he had spoken to at HR.

193.    Even Dr. Krishnan himself told Dr. Noorbaloochi that he thought it was "crazy" that she had "knocked everything out of the park workwise" and was nonetheless denied the promotion because of what he deemed "small" things that HR had amplified.

194.    Dr. Krishnan also told Dr. Noorbaloochi unprompted that Mr. Bhashyam was "a terrible role model" when it came to interpersonal dynamics.

195.    This was yet another example of the double standard at C3; men such as Mr. Bhashyam could have made the exact same comments Dr. Noorbaloochi made without facing any repercussions.

196.    As noted previously, Dr. Noorbaloochi first heard the phrase "listen more and talk less" when Mr. Bhashyam himself used it in front of her.

197.    On another occasion, Mr. Bhashyam had "shushed" Dr. Noorbaloochi at a meeting where several colleagues were present.

198.    Dr. Krishnan had, in effect, unwittingly revealed that men with "interpersonal issues" would not face the same pushback—Mr. Bhashyam, after all, is a Senior Vice President at C3.

199.    Dr. Krishnan encouraged Dr. Noorbaloochi to "suck it up" when facing perceived disrespect from colleagues and to "be the bigger person."

200.    This was just a necessary part of being a leader, he said.

201.    He reiterated that if Dr. Noorbaloochi addressed her "interpersonal issues," presumably by not raising any concerns about sexism in the workplace, she would receive the promotion during the next review cycle.

202.    Five days later, Dr. Noorbaloochi met with Dr. Ohlsson in part to discuss his perspective on the denied promotion and to seek his advice on how she could improve.

203.    Dr. Ohlsson had recently filled out a performance review for Dr. Noorbaloochi that, while generally positive, mentioned that she could "[f]ocus on improving [her] ability to both receive and give feedback" and specifically cited the incident with Mr. Li in this respect.

204.    Surprisingly, Dr. Ohlsson had not affirmatively reached out to discuss the unexpected denial or otherwise even communicated the decision to her, which is something she would have expected her direct supervisor and manager to have done.

205.    Dr. Ohlsson appeared to agree with Dr. Krishnan that Dr. Noorbaloochi's work product was superb—he noted with approval that she had taken on an increased leadership role in the New York office and thanked her for her efforts to hire new team members.

206.    He then clarified his comment about feedback; Dr. Noorbaloochi's comment to Mr. Li was, in his opinion, "not so professional," and he had told her as such when they discussed the incident after it happened.

207.    Dr. Noorbaloochi pushed back in response.  While she admitted that she should not have made the comment at all and sought to apologize, she thought that Mr. Li's behavior warranted criticism as well and that it was unfair that she was the only one who had to deal with consequences for what had happened, while male employees were permitted to treat her harshly without any similar repercussions.

208.    Dr. Ohlsson characterized this as "not receiving feedback well" and did not explain why.

209.    In essence, Dr. Noorbaloochi had once again been given a vague negative label simply for speaking up for herself when she felt she had been mistreated, whereas male employees exhibited comparable or worse behavior and, far from receiving similar repercussions, were readily rewarded with promotions.

210.    Dr. Noorbaloochi then told Dr. Ohlsson that she felt he "had not had her back" and that he was the reason she was not promoted.

211.    If he had supported her at all over the past months—with Mr. Huang, Mr. Li, and HR—she would have gotten the promotion that she deserved.

212.    Dr. Noorbaloochi explained that she was "heartbroken"—not because she had been denied the promotion, but because Dr. Ohlsson, her long-time supervisor whom she had confided in and considered a friend, did not stand up for her.

213.    Dr. Ohlsson seemed to accept Dr. Noorbaloochi's feedback, at first stating that he appreciated what she had said and that he wanted to keep working with her.

214.    Dr. Noorbaloochi then raised that she believed she had been retaliated against for raising complaints of gender discrimination: for example, for telling Mr. Huang that she hoped his treatment of her was not because of her gender.

215.    Even though she had refrained from making a formal complaint after speaking with Mr. Taylor and Mr. Bhashyam, she felt that the Company had retaliated anyway by denying her the promotion, citing her legitimate complaints as "interpersonal issues."

216.    The use of the word "retaliation" clearly alarmed Dr. Ohlsson, who quickly ended the conversation.

217.    Dr. Noorbaloochi had now twice expressed concerns about unlawful discriminatory behavior at C3—first, that she had been exposed to a hostile work environment based on gender, and second, that she had been retaliated against for expressing her concerns about a work environment hostile to her as a woman and to women in general.

218.    As Mr. Bhashyam had previously explained, Dr. Noorbaloochi "was going to hurt [herself] by doing this."

219.    The first time cost her a promotion.

220.    The second would result in her termination.

221.    Just days later, Dr. Krishnan scheduled a call between himself, Dr. Noorbaloochi, and Dr. Ohlsson.

222.    At the meeting, Dr. Krishnan informed Dr. Noorbaloochi that he had met with Mr. Taylor and other HR employees the day before, who had told him that Dr. Noorbaloochi had expressed concerns about "retaliation."

223.    Dr. Krishnan quickly and repeatedly stated that there "was no retaliation," but failed to explain why.

224.    There were "some issues," but he insisted—without explanation—that no one had retaliated.

225.    Dr. Noorbaloochi disagreed.

226.    First, to assuage Dr. Krishnan, she said that she would not take any formal action.

227.    Then, she said she interpreted the situation differently because HR had known that there were underlying issues that led to Dr. Noorbaloochi's initial comment to Mr. Huang and had failed to address them in any capacity.

228.    Instead, HR caused her to be denied a promotion because of perceived "interpersonal issues" while simultaneously allowing Mr. Huang himself to be promoted.

229.    Dr. Ohlsson quickly attempted to change the story.

230.    First, he denied that HR blocked the promotion because of Dr. Noorbaloochi's "interpersonal issues," even though both he and Dr. Krishnan had explicitly stated that was exactly what had happened just days prior.

231.    Now, he said, the denied promotion was because of her supposed inability to take feedback well.

232.    Dr. Ohlsson and Dr. Krishnan were attempting damage control—they knew that their previous explanation was entirely unconvincing.

233.    It became even more apparent to Dr. Noorbaloochi that C3's failure to promote her was directly correlated with her having raised legitimate concerns about gender discrimination.

## V.    DEFENDANTS TERMINATE DR. NOORBALOOCHI AFTER SHE COMPLAINS OF THIS RETALIATION

234.    Unbeknownst to Dr. Noorbaloochi, vocalizing these concerns was unacceptable; C3 would not tolerate any further complaints of discrimination or retaliation.

235.    Dr. Krishnan again tried to explain that Dr. Noorbaloochi should refrain from speaking up for herself when she felt disrespected or undermined.

236.    If you respond, Dr. Krishnan said, "you will lose respect."

237.    And when the response is "fiery," it "causes even more trouble."

238.    Before Dr. Noorbaloochi could respond, Dr. Krishnan changed the subject to an unrelated issue regarding an account.

239.    Dr. Krishnan and Dr. Ohlsson's feedback over the course of the three meetings evoked classic sexist tropes—if a woman was quiet and timid in the workplace, she would be treated poorly, held back, and deemed 'unsuited for leadership positions.' But if she were to assert herself, she would be called 'bossy' and 'rude.'

240.    Any expression of enthusiasm around her work was denounced as "fiery" and "disrespectful," whereas a man exhibiting similar characteristics would be lauded as 'committed' and 'zealous.'

241.    Dr. Noorbaloochi had, in effect, been presented with a Catch-22.  She could either keep quiet and avoid speaking up to appease her male colleagues, which would inevitably stymie her from future achievements, or she could continue to advocate for herself in the workplace and risk being deemed 'difficult' or as having 'interpersonal issues.'

242.    Of course, Dr. Noorbaloochi's attitude and communication style had not changed overnight and had not previously prevented her from excelling at her job.

243.    She was the same employee who had:

- Been promoted twice in less than three years and had been on track for a third promotion in less than five years;
- Consistently earned large discretionary bonuses;
- Received exclusively strong performance reviews;
- Successfully managed data science teams on a Bank of America Center of Excellence worth tens of millions of dollars;
- Closed a multi-year eight-figure continuation with Bank of America;
- Helped C3 enter the healthcare space through a multi-year partnership deal with Quest Diagnostics;
- Secured a promising pilot in the life sciences with Bristol Myers Squibb; and
- Earned the support of CEO Tom Siebel.

244.    Only one thing had changed: Dr. Noorbaloochi raised concerns about a hostile work environment and retaliation.

245.    And at C3, even the suggestion that women are not given a level playing field was fatal.

246.    C3 leadership, including Dr. Ohlsson, quickly mobilized and began working to gain leverage over Dr. Noorbaloochi.

247.    The Company implemented a contingency plan meant to discredit Dr. Noorbaloochi should she ever attempt to publicly complain about discrimination and retaliation at C3.

248.    As Dr. Noorbaloochi is now aware, almost immediately after the meeting between Drs. Noorbaloochi, Ohlsson, and Krishnan, Dr. Ohlsson instructed Suman Tripathy ("Ms. Tripathy"), a junior data scientist who reported to Dr. Noorbaloochi, to collect negative feedback about Dr. Noorbaloochi's skills and performance.

249.    His goal was to give the Company deniability by depicting Dr. Noorbaloochi in as unfavorable a light as possible.

250.    On January 15 and 17, Ms. Tripathy sent Dr. Ohlsson emails containing the compiled feedback.

251.    Dr. Ohlsson never mentioned this feedback to Dr. Noorbaloochi.

252.    In fact, he did not even respond to Ms. Tripathy.

253.    One would think that such harsh criticism from a junior employee would warrant some sort of reaction, but Dr. Ohlsson did nothing.

254.    This is because the feedback was not meant to be acted upon.

255.    It was merely an insurance policy for C3 should Dr. Noorbaloochi ever attempt to hold the company accountable for the way she had been treated.

256.    By May 2025, enough time had passed that C3 leadership believed they could get rid of Dr. Noorbaloochi without raising any red flags.

257.    Dr. Ohlsson called Dr. Noorbaloochi into a virtual meeting.

258.    To her surprise, Mr. Taylor was also present.

259.    Mr. Taylor, who was located in California, told Dr. Noorbaloochi that she was being terminated for what he vaguely deemed "performance-based reasons," even though the only major concerns that had ever been expressed to Dr. Noorbaloochi were her so-called "interpersonal issues" and her supposed "inability to take feedback well."

260.    In fact, Dr. Noorbaloochi had been repeatedly told over the course of her tenure that her performance was outstanding—by Dr. Ohlsson, Dr. Krishnan, Mr. Bhashyam, and even Mr. Siebel himself.

261.    No one mentioned the feedback that Ms. Tripathy had collected.

262.    Dr. Noorbaloochi, having recently been told that she was on the cusp of a promotion to Vice President, was stunned.

263.    She had hoped to ask what Mr. Taylor meant by "performance-based reasons,' but the conversation was too brief and one-sided for her to do so.

264.    Dr. Ohlsson hardly said a word.

265.    His silence spoke volumes: after years of telling Dr. Noorbaloochi that her work product was superb and that he enjoyed working with her, he could not plausibly tell her that she was being terminated without any sort of warning for poor performance.

266.    C3's proffered reason for Dr. Noorbaloochi's termination is plainly false and pretextual.

267.    C3's decision to terminate Dr. Noorbaloochi stemmed primarily and directly from her complaints about a hostile work environment and retaliation.

268.    The vague assertion that her performance was deficient, mere months after the highest-ranking leader in her division told her that her work was outstanding, does not make logical sense or have any basis in fact.

269.    C3, through its employees Dr. Krishnan, Dr. Ohlsson, and Mr. Taylor, among others, developed a plan to manufacture evidence that would provide a pretextual basis for Dr. Noorbaloochi's termination and undermine any potential claims she might assert against the Company.

270.    This plan failed.

271.    Dr. Noorbaloochi possesses considerable evidence that unequivocally reveals what actually happened: she dealt with a hostile work environment, she complained about it and was retaliated against, and when she expressed her belief that C3 had retaliated against her, it developed a pretext and fired her.

272.    Dr. Noorbaloochi is deeply committed to holding C3 accountable for perpetuating a hostile work environment and for retaliating against her.

### FIRST CAUSE OF ACTION
**(Gender Discrimination/Hostile Work Environment in Violation of the NYSHRL)**
**(*Against all Defendants*)**

273.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

274.    As described herein, Defendants discriminated against Plaintiff because of her gender by, *inter alia*, subjecting her to a hostile work environment, retaliatory hostile work environment, and denying her the equal terms and conditions of employment because of her gender.

275.    Plaintiff has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' discriminatory conduct in violation of the NYSHRL, for which she is entitled to an award of damages.

276.    Plaintiff is entitled to an award of punitive damages because Defendants' discriminatory conduct constituted a reckless, malicious, willful, and wanton violation of the NYSHRL.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### (*Against all Defendants*)

277.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

278.    As described herein, Defendants retaliated against Plaintiff by denying her a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the NYSHRL.

279.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' retaliatory conduct in violation of the NYSHRL.

280.    Plaintiff is entitled to an award of punitive damages because Defendants' retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of the NYSHRL.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting Gender Discrimination/Hostile Work Environment and Retaliation in Violation of the NYSHRL)
### (*Against Defendants Ohlsson and Krishnan*)

281.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

282.    As described herein, Defendants Ohlsson and Krishnan knowingly or recklessly aided and abetted the unlawful employment practices committed against Plaintiff by subjecting her to a hostile work environment, subjecting her to a retaliatory hostile work environment, denying her the equal terms and conditions of employment because of her gender, and denying her

a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the NYSHRL.

283.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' violations of the NYSHRL.

284.    Plaintiff is entitled to an award of punitive damages because Defendants' discriminatory and retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of the NYSHRL.

## FOURTH CAUSE OF ACTION
### (Gender Discrimination/Hostile Work Environment in Violation of the NYCHRL)
### (*Against all Defendants*)

285.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

286.    As described herein, Defendants discriminated against Plaintiff because of her gender by, *inter alia*, subjecting her to a hostile work environment, retaliatory hostile work environment, and denying her the equal terms and conditions of employment because of her gender.

287.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' discriminatory conduct in violation of the NYCHRL.

288.    Plaintiff is entitled to an award of punitive damages because Defendants' discriminatory conduct constituted a reckless, malicious, willful, and wanton violation of the NYCHRL.

**FIFTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
**(*Against all Defendants*)**

289.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

290.    As described herein, Defendants retaliated against Plaintiff by denying her a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the NYCHRL.

291.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' retaliatory conduct in violation of the NYCHRL.

292.    Plaintiff is entitled to an award of punitive damages because Defendants' retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of the NYCHRL.

**SIXTH CAUSE OF ACTION**
**(Aiding and Abetting Gender Discrimination/Hostile Work Environment and Retaliation in Violation of the NYCHRL)**
**(*Against Defendants Ohlsson and Krishnan*)**

293.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

294.    As described herein, Defendants Ohlsson and Krishnan knowingly or recklessly aided and abetted the unlawful employment practices committed against Plaintiff by subjecting her to a hostile work environment, subjecting her to a retaliatory hostile work environment, denying her the equal terms and conditions of employment because of her gender, and denying her a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the NYCHRL.

295.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' violations of the NYCHRL.

296.    Plaintiff is entitled to an award of punitive damages because Defendants' discriminatory and retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of the NYCHRL.

## SEVENTH CAUSE OF ACTION
### (Discrimination/Hostile Work Environment in Violation of FEHA)
### (*Against all Defendants*)

297.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

298.    As described herein, Defendants discriminated against Plaintiff by denying her a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the FEHA.

299.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' retaliatory conduct in violation of the FEHA.

300.    Plaintiff is entitled to an award of punitive damages because Defendants' retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of the FEHA.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of FEHA)
### (*Against all Defendants*)

301.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

302.    As described herein, Defendants retaliated against Plaintiff by denying her a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the FEHA.

303.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' retaliatory conduct in violation of the FEHA.

304.    Plaintiff is entitled to an award of punitive damages because Defendants' retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of FEHA.

## NINTH CAUSE OF ACTION
**(Aiding and Abetting Gender Discrimination/Hostile Work Environment and Retaliation in Violation of the FEHA)**
**(*Against Defendants Ohlsson and Krishnan*)**

305.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

306.    As described herein, Defendants Ohlsson and Krishnan knowingly or recklessly aided and abetted the unlawful employment practices committed against Plaintiff by subjecting her to a hostile work environment, subjecting her to a retaliatory hostile work environment, denying her the equal terms and conditions of employment because of her gender, and denying her a promotion and terminating her employment because she made protected complaints regarding Defendants' discriminatory conduct in violation of the FEHA.

307.    Plaintiff is entitled to an award of damages because she has suffered and continues to suffer economic and other compensatory damages as a direct and proximate result of Defendants' violations of the FEHA.

308.    Plaintiff is entitled to an award of punitive damages because Defendants' discriminatory and retaliatory conduct constituted a reckless, malicious, willful, and wanton violation of the FEHA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violated the laws of the United States.

B.    An injunction and order permanently restraining Defendants and Defendant C3's officers, officials, agents, successors, employees, and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein.

C.    An injunction and order requiring Defendants to take appropriate action to protect C3's employees from discrimination and provide avenues from prompt and immediate corrective action should any C3 employee experience discrimination in the workplace, with such measures to include, but not be limited to, those set forth above.

D.    An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensatory damages for reputational harm, emotional distress and/or mental anguish suffered as a result of Defendants' actions.

E.    An award of punitive damages and any applicable penalties in an amount to be determined at trial.

F.    Prejudgment interest on all amounts due.

G.    An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorney's fees and costs to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

### **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  September 10, 2025
        New York, New York

                                            **WIGDOR LLP**

                                            By: _Meredith Firetog_
                                                Meredith Firetog
                                                Noah Jacobs

                                            85 Fifth Avenue
                                            New York, NY 10003
                                            Telephone: (212) 257-6800
                                            Facsimile: (212) 257-6845
                                            mfiretog@wigdorlaw.com
                                            njacobs@wigdorlaw.com

                                            *Counsel for Plaintiff*

41