UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________________
DATE FILED: 9/1/2026

SHARAREH NOORBALOOCHI,

Plaintiff,

-against-

C3.AI, INC.; NIKHIL KRISHNAN, in his individual and professional capacities; and HENRIK OHLSSON, in his individual and professional capacities,

Defendants.

25 Civ. 7527 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Sharareh Noorbaloochi, brings this action against Defendants, C3.aI, Inc. ("C3"), Nikhil Krishnan, and Henrik Ohlsson, alleging that Defendants retaliated against her by denying her a promotion, subjecting her to a hostile work environment, and discriminating against her based on her gender in violation of the New York State Human Rights Law, New York City Human Rights Law, and California Fair Employment & Housing Act. Compl. ¶¶ 1–16, ECF No. 1. Defendants move to compel arbitration under the Federal Arbitration Act ("FAA"). Mot., ECF No. 19; Mem., ECF No. 21. Noorbaloochi argues that the Ending Force Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), 9 U.S.C. § 401–02, precludes arbitration of her claims. Opp., ECF No. 23. For the reasons stated below, Defendants' motion to compel arbitration is DENIED.

**BACKGROUND**

The Court accepts the facts alleged in Noorbaloochi's complaint as true for purposes of this motion. *See Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 252 (S.D.N.Y. 2024); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). In April 2020, Noorbaloochi accepted an offer to work at C3, an artificial intelligence software company. Compl. ¶¶ 2, 44. Over the tenure of her

employment, she was promoted to the title of Director, and then senior Director, ultimately becoming the "highest-ranking woman in data science at C3." *Id.* ¶¶ 47–49.

Noorbaloochi alleges that throughout her employment at C3, she "faced differential treatment when compared to her male colleagues." *Id.* ¶ 75. First, she claims that "[a]s soon as she started at C3," she "faced bizarre pushback to her very presence in a supervisory role," *id.* ¶70, such as: (1) one of her supervisors, Henrik Ohlsson, "refus[ing] to acknowledge" that she "held the position that she did" out of concern for a male employee who was inferior to her, *id.* ¶¶ 71–72; (2) being "excluded from data science planning meetings that she unquestionably should have been a part of," *id.* ¶ 76; (3) receiving criticism from Ohlsson that was not given to similarly-situated male colleagues, *id.* ¶¶ 78, 86–87; and (4) being re-assigned to report to another C3 employee with no advance notice, *id.* ¶¶ 82–85.

Second, Noorbaloochi alleges that, during a C3-sponsored conference in Miami, she discovered an anonymous note "left on the dresser inside her assigned hotel room" that had a phone number and read "[c]all me if you want to have fun." *Id.* ¶¶ 90–94. Noorbaloochi does not allege that any C3 employee wrote or left the note but claims that C3 "did not . . . make any substantial efforts to identify who had left the note or otherwise protect [] Noorbaloochi during" the conference. *Id.* ¶¶ 90–98.

Third, Noorbaloochi alleges that she was denied a promotion and ultimately fired in retaliation for remarks she made criticizing a colleague's differential treatment of her. In early 2024, Noorbaloochi began working on a project with Tiger Huang, a Director at C3, who was below Noorbaloochi in the corporate hierarchy but reported to Mehdi Maasoumy, a Vice President. *Id.* ¶¶ 99–101. Throughout the time they worked together, Noorbaloochi reports that Huang was "inappropriate and rude toward" her, ignored her directions and comments on written work, and "refuse[d] to consult [] Noorbaloochi before corresponding with [C3's CEO about] about the project,

despite her having made multiple direct requests . . . that he do so." *Id.* ¶¶ 102–07. Noorbaloochi claims this behavior violated "common practice" at the company, undermined "the project's efficiency," and differed from how Huang treated male colleagues. *Id.* ¶¶ 107–09. Noorbaloochi states that Huang's direct supervisor, Mehdi Maasoumy, took no action to discipline or correct Huang's actions, even though Noorbaloochi asserts that Maasoumy "plainly observed [Huang]'s behavior." *Id.* ¶¶ 101, 111–13.

In "[s]ummer 2024," Noorbaloochi "had had enough," and "asked [] Huang why she had been excluded from an email" to Tom Siebel, C3's CEO. *Id.* ¶¶ 60, 114. Noorbaloochi also "told []Huang directly," "with [] Ohlsson and [] Maasoumy present," that "she felt he had been treating her unfairly." *Id.* ¶ 118. Dissatisfied with Huang's response, Noorbaloochi added: "I hope this [treatment] isn't because of my gender," *id.* ¶ 119 (brackets in original), which sparked "defensive" outrage from Huang, *id.* ¶¶ 120–23. By email dated July 26, 2024, Noorbaloochi wrote to Maasoumy memorializing her complaint. *Id.* ¶ 128.

Noorbaloochi alleges that, following her discussion with Huang, Huang reported her to C3's HR department. *Id.* ¶¶ 132–35. Although the specific timing of subsequent events is unclear, Noorbaloochi states that, after failing to "investigate[] Noorbaloochi's claims in any depth" or to "ma[ke] any independent inquiry into what he understood had taken place between [] Huang and [] Noorbaloochi," Devon Taylor, a Vice President of HR at C3, "took steps to discourage [her] from filing any official complaint" in a "brief conversation." *Id.* ¶¶ 136–40. Another C3 employee, Adi Bhashyam, who had been "a mentor and confidant to" Noorbaloochi, "chastised" her for the "'mistake' of speaking up in the first place," and told her that "you're going to hurt yourself by doing this," which Noorbaloochi understood to refer to making formal complaints of gender-based differential treatment. *Id.* ¶¶ 142–46. Noorbaloochi alleges that, over the next few months, she

received the "cold shoulder" from Maasoumy, Huang's supervisor, but continued to receive praise from C3's CEO concerning work she had undertaken on the project with Huang. *Id.* ¶¶ 149–62.

In December 2024, during a meeting with several high-level employees, Noorbaloochi became frustrated with Qiwei Li, a junior male employee who "repeatedly interrupted" her and "dismissed her comments at the meeting," prompting Noorbaloochi to state, "maybe it's better for you to listen more and talk less." *Id.* ¶¶ 71, 165–67. She alleges that Ohlsson immediately "reprimanded" her for making the comment, even though she had previously heard "this exact statement" made by another male C3 employee during a work meeting. *Id.* ¶¶ 168–73.

At about the same time that Noorbaloochi began working with Huang, in May 2024, she claims that that Nikhil Krishnan, one of Noorbaloochi's supervisors and a Senior Vice President and Chief Technology Officer at C3, told her to "expect a promotion [] during the next promotion cycle if she took on additional responsibilities" such as overseeing certain data science projects. *Id.* ¶¶ 25, 66. But, in January 2025, Noorbaloochi learned that she would not be promoted, not because of her performance, but because of what her supervisor termed "interpersonal issues" "[coming] from HR" that stemmed from her interactions with Huang and Li. *Id.* ¶¶ 7, 178–85, 190.

Seeking to understand the concerns regarding her "interpersonal issues," Noorbaloochi then scheduled a meeting with Ohlsson, who had mentioned areas for improvement relating to her "ability to both receive and give feedback" in a performance review. *Id.* ¶¶ 202–03. In that discussion, Noorbaloochi expressed frustration that "she was the only one who had to deal with consequences for what had happened, while male employees were permitted to treat her harshly without any similar repercussions" and then "raised that she believed she had been retaliated against for raising complaints of gender discrimination . . . ." *Id.* ¶¶ 204–14.

Ohlsson "quickly ended the conversation," and several days later, Krishnan scheduled a call between himself, Noorbaloochi, and Ohlsson. *Id.* ¶¶ 215–22. They discussed Noorbaloochi's past

concerns and complaints. *Id.* ¶¶ 223–47. Then, "[a]lmost immediately after the meeting," Ohlsson "instructed" a junior employee at C3 to "collect negative feedback about [] Noorbaloochi's skills and performance," which feedback was compiled in January 2025 but not provided to Noorbaloochi at that time. *Id.* ¶¶ 247–55. Then, in May 2025, C3 fired Noorbaloochi, citing "performance-based reasons." *Id.* ¶¶ 256–64.

On September 10, 2025, Noorbaloochi filed the complaint in this action, ECF No. 1, bringing causes of action under the New York Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"), and the California Fair Employment & Housing Act, Cal. Gov. Code §§ 12940 *et seq.* ("FEHA").

On November 24, 2025, Defendants moved to compel arbitration. *See* Mot. Defendants argue that a binding arbitration agreement covers this dispute, *see* Mem. at 2–3, and that because Noorbaloochi's allegations "reflect purported disparate treatment," not sexual harassment, the case should proceed in arbitration. *See* Reply, ECF No. 27 at 1–2. Noorbaloochi argues that her allegations of a hostile work environment constitute a claim for sexual harassment as contemplated by the EFAA. *See* Opp. at 10–11.

## LEGAL STANDARD

The FAA provides that arbitration agreements in contracts involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The statute reflects a "federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation marks omitted). Once a district court is "satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding," it must stay proceedings and direct the parties to proceed to arbitration.

*WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (quoting *McMahan Sec. Co. v. Forum Cap. Mkts. L.P.*, 35 F.3d 82, 85 (2d Cir. 1994)); *see also* 9 U.S.C. §§ 3, 4.

However, in 2022, Congress amended the FAA by enacting the EFAA, which provides that "no predispute arbitration agreement . . . shall be valid or enforceable" in a lawsuit "alleging conduct constituting a sexual harassment dispute[, at the election of the plaintiff]." 9 U.S.C. § 402(a); *see also Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74 (2d Cir. 2024). Applicability of the EFAA is a matter for the Court to decide. 9 U.S.C. § 402(b).

**DISCUSSION**

I. Relevant Pleading Standard

The "threshold requirement" for the EFAA is that a plaintiff must "allege 'conduct constituting a sexual harassment dispute.'" *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 531 (S.D.N.Y. 2024) (quoting 9 U.S.C. § 402(a)). A "sexual harassment dispute" is defined as "a dispute relating conduct that is alleged to constitute sexual harassment under applicable . . . State law." 9 U.S.C. § 401(4).

Courts in this District are divided over whether Plaintiffs must plausibly allege claims of sexual harassment or merely allege non-frivolous claims of sexual harassment for the purposes of the EFAA. *Compare Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 585 (S.D.N.Y. 2023) (applying plausibility standard), *with Diaz-Roa*, 757 F. Supp. 3d at 535 (applying non-frivolous allegation standard). The Court concludes that "[t]he *Diaz-Roa* court persuasively highlights the dubiousness of adjudicating the plausibility of a sexual harassment claim upon a motion to compel arbitration, which is designed to test adjudicative capacity, not the merits or proper pleading of claims." *Gill v. US Data Mgmt., LLC*, No. 24 Civ. 05255, 2024 WL 5402494, at *3 (C.D. Cal. Dec. 2, 2024). Additionally, as *Diaz-Roa* points out, the text of the EFAA contains no requirement that the plaintiff "state a claim for relief (language Congress used in other statutes)," which "suggests that Congress did not intend for

the courts on their own authority to impose such a requirement before a plaintiff was relieved of the obligation to proceed by way of forced arbitration." 757 F. Supp. 3d at 535. The Court declines to read a requirement into the EFAA that Congress did not itself include. Therefore, Noorbaloochi need only allege non-frivolous claims of sexual harassment to prevail against C3's motion.

## II. NYCHRL and NYSHRL

Noorbaloochi has brought non-frivolous claims of sexual harassment under the NYCHRL and the NYSHRL.[1]

Noorbaloochi brings hostile work environment claims under the NYSHRL and the NYCHRL. *See* Compl. ¶¶ 273–96. A hostile work environment is a form of sexual harassment under state and city law. *See Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 182 (S.D.N.Y. 2023) (explaining the "hostile work environment theory of sexual harassment" under the NYCHL)*; see also McHenry v. Fox News Network*, LLC, 510 F. Supp. 3d 51, 64 (S.D.N.Y. 2020) (same under the NYSHRL). As one New York state appellate court has reasoned:

> Despite the popular notion that "sex discrimination" and "sexual harassment" are two distinct things, it is, of course, the case that the latter is one species of sex- or gender-based discrimination. There is no "sexual harassment provision" of the law to interpret; there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender. As applied in the context of sexual harassment, therefore, the relevant question is what constitutes inferior terms and conditions based on gender.

*Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 75 (2009) (citation omitted).

Lewd or sexual conduct is not required to allege a hostile work environment sexual harassment claim. *See Owens*, 786 F. Supp. 3d at 846 (analyzing NYCHRL); *see also O'Donnell v. Magazzino Italian Art Found.*, No. 25 Civ 2918, 2026 WL 880646, at *7 (S.D.N.Y. Mar. 31, 2026)

1 Although the NYCHRL is New York City law, "the term 'State law' in 9 U.S.C. § 401(4) encompasses the law of states' subdivisions and therefore includes the NYCHRL." *Owens v. PriceWaterHouseCoopers LLC*, 786 F. Supp. 3d 831, 843 n.2 (S.D.N.Y. 2025).

(analyzing NYSHRL). A plaintiff may be subject to "inferior terms and conditions [of employment] based on gender," *see Williams*, 61 A.D. 3d at 75, without experiencing lewd conduct.

Any other conclusion would contravene the axiomatic principle that the NYCHRL and the NYSHRL must be construed more broadly than their federal counterpart, Title VII, "for the accomplishment of [their] uniquely broad and remedial purposes." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (describing NYCHRL); *see also O'Donnell*, 2026 WL 880646, at *7–8 (explaining similar standard for the contemporary NYSHRL). Hostile work environment claims have long been recognized as a form of sexual harassment actionable under Title VII. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65 (1986)) ("A plaintiff seeking relief against an employer for sexual harassment in the [workplace] can proceed under two theories: quid pro quo harassment [or] a hostile work environment."). This is true regardless of whether the harassment was associated with "sexual desire." *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001); *see also King v. Aramark Servs. Inc.*, 96 F.4th 546, 562 (2d Cir. 2024).

Noorbaloochi's claim of a sex-based hostile work environment under the NYCHL and the NYSHRL are non-frivolous. Her allegations include that she was consistently talked over, interrupted, and left out of meetings and off emails, while male colleagues were not subject to the same treatment, Compl. ¶¶ 129, 166, 197; that her managerial authority was not acknowledged by her male supervisor out of concern for a male subordinate's feelings, *id.* ¶ 71; that she was criticized in gendered terms as "emotional" and "bossy," *id.* ¶¶ 79, 239; that she was reprimanded for "disrespect" when she provided feedback using the same language that a male colleague had used without pushback, *id.* ¶¶ 168, 172; and that C3 failed to adequately respond to an anonymous, apparently sexually threatening note left in Noorbaloochi's hotel room at a C3-sponsored conference. *Id.* ¶¶ 90–97. Taken together, Noorbaloochi has alleged facts indicating that she was "demeaned in a

manner that her male colleagues were not." *Faruque v. JP Morgan Chase & Co.*, No. 24 Civ 5734, 2026 WL 1964826, at *6 (E.D.N.Y. Feb. 17, 2026), *report and recommendation adopted*, 2026 WL 1964820 (E.D.N.Y. Mar. 4, 2026). Under the liberal standards of the NYCHRL and NYSHRL, her allegations are "sufficient to plausibly plead" a violation, *see id.*, and more than suffice for the non-frivolous standard applicable here. *See also O'Donnell*, 2026 WL 880646, at *9 (holding that allegations of differential, worse treatment of women "constitute[d] a nonfrivolous allegation related to gender-based harassment").

Noorbaloochi also brings retaliation claims arising from her complaints about the alleged hostile work environment. Compl. ¶¶ 277–296. These claims are also within the scope of the EFFA's sexual harassment exemption because "retaliation resulting from a report of sexual harassment is 'relat[ed] to conduct that is alleged to constitute sexual harassment.'" *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 92 (2d Cir. 2024) (quoting 9 U.S.C. § 401(4)); *accord Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 551 n.13, 559 (S.D.N.Y. 2023).

III. California Law

Noorbaloochi brings claims under the California Fair Employment and Housing Act ("FEHA"). *See* Compl. ¶¶ 297–308. California law defines sexual harassment as "harassment because of sex, . . . includ[ing] sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions." Cal. Gov. Code § 12940(j)(4)(C). Regulations provide that harassment encompasses "verbal, physical, and visual harassment, as well as unwanted sexual advances," Cal. Code Regs. tit. 2, § 11034(f).

"California courts have adopted the [Title VII] standard for hostile work environment sexual harassment claims under the FEHA[.]" *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 279 (2006). As previously discussed, gender-based hostile work environment claims, whether involving lewd conduct or not, are a category of sexual harassment under Title VII; so too under the FEHA.

The California Supreme Court has explained that "it is the disparate treatment of an employee on the basis of sex . . . that is the essence of a sexual harassment claim" under the FEHA. *Id.* at 280.

To establish a claim for hostile work environment sexual harassment under the FEHA, a plaintiff must demonstrate that: "(1) she is a member of a protected group; (2) she was subjected to harassment because she belonged to this group; and (3) the alleged harassment was so severe that it created a hostile work environment." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013). C3 will have the opportunity to dispute whether Noorbaloochi can demonstrate that her allegations satisfy this more demanding standard as this case is adjudicated on the merits. For the purposes of this motion, Noorbaloochi has non-frivolously alleged a FEHA harassment claim through her allegations of differential treatment from male colleagues and gendered criticism. *See Gill*, 2024 WL 5402494, at *3 (finding that FEHA sexual harassment dispute was non-frivolous because of allegations that a defendant "made specific insulting comments about [p]laintiff based on her gender").

**CONCLUSION**

For the reasons stated above, Defendants' motion to compel arbitration is DENIED. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 19.

SO ORDERED.

Dated: September 1, 2026
New York, New York

ANALISA TORRES
United States District Judge